Julie Pollock (SBN 346081)
**BERGER MONTAGUE PC**
505 Montgomery St, Suite 625
San Francisco, CA 94111
Tel: (415) 906-0684
Fax: (215) 875-4604
jpollock@bm.net

*Counsel for Plaintiffs*
*(additional counsel listed on signature page)*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Francisco Division

| | |
|---|---|
| TERESA ROWLAND, LIZ CHAVEZ, and PAUL CHAVEZ, individually and as representatives of the classes, <br><br> Plaintiffs, <br><br> v. <br><br> SPECIALIZED LOAN SERVICING, LLC, <br><br> Defendant. | Case No.   23-cv-5529 <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Teresa Rowland, Liz Chavez, and Paul Chavez ("Plaintiffs"), on behalf of themselves and the classes set forth below, state as follows:

### INTRODUCTION

1.     In the years leading up to the Great Recession, predatory subprime mortgage lenders began targeting potential homebuyers like Plaintiffs with a simple, irresistible offer: the opportunity to own a home without having to put down a single dollar.  These so-called "80/20" mortgage schemes typically involved two mortgages:  a primary mortgage that covered 80% of the home's appraised value, plus a second "piggyback" mortgage for remaining 20%, which took the place of a down payment and allowed borrowers to avoid costly mortgage insurance.[1]

---

[1] The Consumer Financial Protection Bureau describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a

2.      Although these second mortgages came with serious disadvantages, including high interest rates and large balloon payments set to become due at the end of the loans, borrowers like Plaintiffs were assured that they could simply refinance their loans to avoid these future downsides.

3.      But as the 2007-09 economic downturn began to take hold, home prices started to fall, and borrowers of these "80/20" mortgages were quickly swept underwater as the value of their homes fell below the total amount of their mortgage debt.  Many of these borrowers, like Plaintiffs, later faced threats of foreclosure after they were unable to keep current on their mortgage payments.

4.      Until recently, Plaintiffs and the similarly situated homebuyers they seek to represent in this case thought they had escaped the worst of the Great Recession.  Although they had been victims of these predatory "80/20" mortgage-loan schemes, and although they had later faced foreclosure during the housing crisis, they had successfully fought to stay in their homes with the help of first-lien loan modifications or bankruptcy filings.

5.      And while Plaintiffs and class members knew that they had also taken out second-lien mortgage loans, they believed that their issues with these loans had also been resolved—a belief that was then supported by the fact that, over the following years, they received no periodic mortgage statements (or communications of any kind) from their second-lien lenders or servicers.

6.      Unbeknownst to Plaintiffs and class members, however, these lenders and servicers had not disappeared.  Instead, it seems, they were merely lying in wait.

7.      And now, following the recent nationwide surge in home prices that has allowed homeowners like Plaintiffs and class members to regain the home equity they lost during the

---

second lien loan for the remaining 20% of the home's valuation."  *See* CONSUMER FIN. PROT. BUREAU, *CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages (last visited Oct. 23, 2023).

CLASS ACTION COMPLAINT - 2

Great Recession, these lenders and servicers have suddenly reappeared, demanding payment on their long-forgotten second-lien mortgage loans.

8.      Even worse, predatory loan servicers like Defendant Specialized Loan Servicing, LLC ("SLS") have begun acquiring defaulted second-lien mortgage loans and threatening foreclosure unless borrowers like Plaintiffs and class members pay, not only the unpaid and past-due principal amounts on their second-lien loans, but massive sums of additional, *retroactive* interest and fees that, these servicers claim, accrued while they remained silent and failed to send periodic mortgage statements to the borrowers.

9.      Here, for example, SLS has demanded that Plaintiff Teresa Rowland pay more than $50,000 in interest and fees that purportedly accrued during the period in which Ms. Rowland did not receive any periodic statements.

10.     Likewise, SLS now claims that Plaintiffs Liz and Paul Chavez owe over $90,000 in interest and fees that supposedly accrued while they were not receiving periodic statements.

11.     Plaintiffs are far from the only victims of SLS's opportunistic and predatory practices; indeed, as discovery will show, it is apparently standard policy and practice for SLS to demand payment of improper, retroactively-assessed interest and fees.

12.     Discovery will also show that SLS has a standard policy and practice of failing to respond to its borrowers' Qualified Written Requests for information about these exorbitant demands.

13.     To put a stop to SLS's unlawful practices, Plaintiffs now bring this action on behalf of themselves and the members of the classes defined below, seeking redress under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*; the Rosenthal Debt Collection Practices Act ("Rosenthal Act"), CAL. CIVIL CODE §§ 1788 *et seq.*; and the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

14.     Plaintiffs also bring individual claims for SLS's violations of the FDCPA, the Rosenthal Act, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*, and the California Homeowner Bill of Rights ("HBOR"), CAL. CIVIL CODE §§ 2920, *et seq.*

**PARTIES**

15.     Plaintiff Teresa Rowland is a resident of Fremont, California.

16.     Plaintiffs Liz Chavez and Paul Chavez are residents of Oxnard, California.

17.     Defendant Specialized Loan Servicing, LLC ("SLS") is a limited-liability company incorporated in Delaware with a principal place of business in Highlands Ranch, Colorado.  SLS is a mortgage-loan servicing company governed by RESPA.

**JURISDICTION AND VENUE**

18.     The Court has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, 15 U.S.C. § 1692k(d), and 12 U.S.C. § 2614.

19.     The Court has personal jurisdiction over SLS.  SLS conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

20.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

21.     **Divisional Assignment.**  Pursuant to Civ. L.R. 3-2(c), this action should be assigned to the San Francisco Division, as the first-listed Named Plaintiff resides in Alameda County.

**FACTUAL ALLEGATIONS**

***The Recent Rise of Illegal Collection Efforts on Zombie Second Mortgages***

22.     This case arises from the recent wave of attempts to collect so-called "zombie" second mortgages.  These second mortgages, the vast majority of which are "subprime" mortgages that were originated in the years leading up to the 2007-08 mortgage crisis, are referred to as "zombies" because their lenders ceased all collections efforts or communications with their borrowers—often for a *decade* or more.  Yet now, after years without any communication, and often after a long chain of debt sales and re-sales, debt collectors have suddenly reemerged and begun to demand exorbitant interest and fees on top of debts that consumers had understandably believed were long-dead.

---

23.     Before the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages.  By enticing borrowers to finance 80% of their home through a traditional first mortgage, and the remaining 20% through a second mortgage, lenders were able to extend loans to underqualified borrowers without requiring a down payment and without requiring the borrowers to pay for mortgage insurance.

24.     But these second mortgages were incredibly disadvantageous for their borrowers, as they often carried high interest rates and involved large balloon payments set to become due at the end of the loan.

25.     During the Great Recession, as a result of so many underqualified borrowers having been saddled with debt they could not afford, many borrowers who were the victims of these "80/20" mortgage schemes needed to modify their first mortgages to remain in their homes. At the same time, many of these borrowers' second mortgages were charged off, significantly reduced, or even forgiven as part of governmental relief programs, including the HAMP Second Lien Modification Program ("2MP Program").[2]

26.     Once these second mortgages were charged off or extinguished, lenders and servicers no longer sent statements or initiated any communications to the borrowers of these second mortgages—often remaining silent for more than a decade, as in the case of Ms. Rowland and the Chavezes.

27.     Because second-lien charge-offs or cancellations typically happened around the time that consumers modified their first mortgages, many consumers believed that the modification of their first mortgage had also resolved their second mortgage.  This understandable

---

[2] *See* DEP'T OF HOUSING AND URBAN DEVELOPMENT, *Making Home Affordable Program Performance Report Through May 2014*, at 2, *available at* https://www.hud.gov/sites/ documents/MAY2014MHAREPORTFINAL.PDF (noting that the Second Lien Modification Program "[p]rovides modifications and extinguishments on second liens when there has been an eligible first lien modification on the same property") (last visited Oct. 12, 2023).

belief was then confirmed by the fact that many second-mortgage lenders completely stopped sending periodic statements to borrowers.

28.     Unbeknownst to many consumers, however, their second mortgages did not go away.  Instead, these second mortgages were often sold—and resold—to various debt buyers and subprime lenders.

29.     Now, with the recent surge in home values, these consumers have accumulated significant equity in their homes, making the prospect of collecting or foreclosing on charged-off second mortgages highly attractive.

30.     Seeking to leverage higher home values, debt buyers and servicers are now seeking to collect on defaulted second mortgages and, if consumers cannot pay, they are foreclosing on homes, selling the property, and taking the (often significant) equity as profits on the outstanding loan—which they likely bought for pennies on the dollar.

31.     This highly profitable scheme has surged in recent months, as home prices have increased and COVID-19 foreclosure moratoriums have expired.

32.     In this case, SLS is attempting to collect from Ms. Rowland and the Chavezes, in addition to unpaid and past-due principal, vast sums of additional interest and fees to which it is *not* entitled.

33.     With Plaintiffs unable to pay the exorbitant amounts of interest and fees SLS claims are owed, SLS is now seeking to foreclose on Plaintiffs' homes.

34.     SLS's conduct is illegal.

35.     Under Truth-in-Lending-Act regulations, once a mortgage is charged off, the servicer is no longer required to send periodic statements—but if it chooses not to send periodic statements, it may not assess any additional late fees or interest on the account.  *See* 12 C.F.R. § 1026.41(e)(6)(i).

36.     If the servicer later resumes sending periodic statements, it may then resume charging interest and fees on the account—but importantly, it may not *retroactively* assess any fees or interest for the period during which it (or its predecessors-in-interest) failed to send

periodic statements to the borrower.  *See* 12 C.F.R. § 1026.41(e)(6)(ii).  SLS's conduct clearly violates this provision.

37.     Similarly, SLS's conduct violates the FDCPA and the Rosenthal Act because SLS is making false representations about the character, amount, or legal status of a debt (15 U.S.C. § 1692e(2)(A); Cal. Civil Code § 1788.17); threatening to take action that cannot be legally taken (15 U.S.C. § 1692e(5), Cal. Civil Code § 1788.17); and using false representations to collect or attempt to collect a debt (15 U.S.C. § 1692e(10), Cal. Civil Code § 1788.17).  SLS's conduct also violates the UCL because its debt-collection practices are unlawful, fraudulent, and unfair.

38.     Despite these clear legal prohibitions, servicers like SLS are retroactively assessing late fees and adding interest to the loans—amounts that were waived by the prior loan servicers—and are thus seeking to collect vastly inflated amounts from consumers.

39.     In Ms. Rowland's case, for example, SLS inflated Ms. Rowland's purported loan balance by more than $50,000 of improper fees and charges.  Similarly, SLS inflated the Chavezes' loan balance by more than $90,000 by means of such improper fees and charges.

40.     Plaintiffs are not alone.  The Consumer Financial Protection Bureau ("CFPB") has "received a concerning number of consumer complaints and has heard from advocates about what are sometimes referred to as zombie second mortgages. Homeowners may think that a mortgage debt was forgiven or was satisfied long ago by loan modifications or bankruptcy proceedings. Then years later, debt collectors reach out threatening foreclosure and demanding the homeowner pay the outstanding balance of the mortgage, along with years of interest and fees."[3]

41.     Considering the wave of efforts to illegally collect purportedly accrued interest and fees on these "zombie" second mortgages, the CFPB has issued an advisory opinion plainly stating that the collection of time-barred debt violates the law:

---

[3] Consumer Fin. Prot. Bureau, *Zombie second mortgages: When collectors come for long forgotten home loans*, https://www.consumerfinance.gov/about-us/blog/zombie-second-mortgages-when-collectors-come-for-long-forgotten-home-loans/ (last visited Oct. 19, 2023).

The CFPB is issuing this advisory opinion to affirm that: (1) the FDCPA and its implementing Regulation F prohibit a debt collector, as that term is defined in the statute and regulation, from suing or threatening to sue to collect a time-barred debt; and (2) this prohibition applies even if the debt collector neither knows nor should know that the debt is time barred.  Accordingly, an FDCPA debt collector who brings or threatens to bring a State court foreclosure action to collect a time-barred mortgage debt may violate the FDCPA and Regulation F.[4]

42.     In addition to its violations of TILA, the FDCPA, and California state law, SLS has also violated RESPA by failing to properly respond—or, indeed, to respond *at all*—to consumers who have requested information concerning the exorbitant retroactive fees and interest that SLS has attempted to extract from them.

43.     Specifically, RESPA provides consumers with a right to information about their loans, but SLS fails to respond when consumers seek this information.

44.     "RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans."[5]

45.     "Specifically, with respect to mortgage servicing, the consumer protection purposes of RESPA include responding to borrower requests and complaints in a timely manner, maintaining and providing accurate information, helping borrowers avoid unwarranted or unnecessary costs and fees, and facilitating review for foreclosure avoidance options." *Id.*

46.     Consistent with these purposes, RESPA imposes mandatory duties on mortgage servicers in responding to borrower inquiries.  12 U.S.C. § 2605(e).

47.     When a servicer receives a Qualified Written Request from a borrower, § 2605(e) requires it to investigate and provide the borrower with a written explanation or clarification, which must include: (1) the information requested by the borrower or an explanation of why the

---

[4] *See* Fair Debt Collection Practices Act (Regulation F); Time-Barred Debt, 88 Fed. Reg. 26475 (May 1, 2023); *see also* Michael Hill, "*Zombie Debt": Homeowners face foreclosure on old mortgages*, ASSOCIATED PRESS, Nov. 16, 2022, *available at* https://apnews.com/article/business-mortgages-44b1ffad08a80b96a8630e091d1e96f2.

[5] *Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X)*, 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024) ["2013 Regulation X Amendments"].

information requested is unavailable; **and** (2) the name and telephone number of a servicer employee who can help the borrower.

48.    These requirements and the corresponding civil liability were first added to RESPA in 1990 by the Cranston-Gonzalez National Affordable Housing Act, as part of a broader effort to set a national housing policy and ensure that every American family could afford a decent home in a suitable environment.  *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101–625, §§ 101, 102, 941, 104 Stat 4079 (1990).

49.    In responding to the 2007–08 financial crisis, Congress further amended § 2605 to: (1) increase penalties that servicers incur for violating § 2605(e); and (2) authorize the Consumer Financial Protection Bureau to promulgate appropriate regulations to carry out RESPA's consumer-protection purposes.  *See* 2013 Regulation X Amendments, *supra* note 5, at 10709.  A servicer that ignores the requirements of § 2605(e) is liable to its borrower for the actual damages caused by each such failure—and, for a pattern or practice of noncompliance, additional damages of up to $2,000.  12 U.S.C. § 2605(f).

50.    RESPA's protections, including § 2605(e), were thus specifically designed to ensure that borrowers have timely access to accurate information about their accounts, that borrowers can avoid unnecessary fees and charges, and that borrowers can explore all available options to avoid foreclosure of their homes.  *See id.*

51.    RESPA's remedial nature provides a necessary incentive for mortgage servicers to comply with its requirements.  *See* 2013 Regulation X Amendments, *supra*, at 10701.  Given the unique attributes of the servicing market, servicers are motivated "to look for opportunities to impose fees on borrowers to enhance revenues."  *Id.*  The Bureau has observed that servicers "earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements."  *Id.*  Thus, the imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieving the statute's consumer-protection objectives.

52.     Despite RESPA's clear command to respond to consumer Qualified Written Requests, SLS has failed (and continues to fail) to do so, further cloaking in secrecy its efforts to collect large amounts from consumers after decades of silence, and exacerbating the understandable angst and worry that consumers experience when they are confronted with exorbitant demands for money and threats of foreclosure.

### Teresa Rowland

53.     In August 2006, Teresa Rowland bought a home in Fremont, California.

54.     To finance the purchase of her home, Ms. Rowland took out two mortgages.

55.     Ms. Rowland's second mortgage had a principal balance of $81,000 at origination.

56.     A few years later, as became common for homeowners during the Great Recession, falling home prices swept Ms. Rowland "underwater" when the value of her home fell below the total amount she owed under her two mortgage loans, and she began to fall behind on her mortgage payments.

57.     Sometime in or before March 2010, SLS became the mortgage servicer of Ms. Rowland's second-lien mortgage loan.

58.     Before SLS acquired the servicing rights to Ms. Rowland's second-lien mortgage loan, Ms. Rowland had already defaulted on the loan.

59.     For the next twelve years following its installation as the servicer on Ms. Rowland's second-lien mortgage loan, SLS did not send Ms. Rowland any periodic statements—or, indeed, any communications whatsoever.

60.     Then, on March 18, 2022, after over a decade of silence, SLS sent a letter titled "Default Notice and Notice of Intent to Foreclose," in which it stated:

> The Note on the [second-lien mortgage loan] is now in default as a result of your failure to pay the 05/20/08 payment and the payments due each month thereafter, as provided for in said Note.  You are hereby notified that to cure such default you are required to pay to this office all past due payments plus late charges and any payments that may become due between the date of this notice and the date the default is cured.  The amount required to cure the arrears as of 03/18/22 is $128,800.60.  You have thirty-three (33) days from the date of this letter to cure the default.  We urge you to immediately, upon receipt of this letter, contact our

Customer Assistance Department at the number below to obtain the updated amount required to reinstate your loan.

61.     The March 2022 letter further stated: "Failure to pay the total amount due under the terms and conditions of your Deed of Trust/Mortgage by 04/20/22 may result in acceleration of the entire balance outstanding under the Note including, but not limited to, the principal, interest and all other outstanding charges and costs, and commencement of foreclosure of the Trust Deed/Mortgage which is security for your Note."  SLS also warned in this letter that "[i]f your loan is not brought current, inspections of your property will be made and you will be assessed fees for that purpose as permitted under state law."

62.     The $128,600.60 in "arrears" demanded by SLS included $77,773.96 in remaining principal, plus over $50,000 in retroactive interest and fees that had purportedly accrued over the previous decade-plus.

63.     This sudden increase in Ms. Rowland's mortgage-debt load caused a significant reduction in her home equity.

64.     Concerned, and confused at the sudden reappearance of SLS after so many years of silence, Ms. Rowland contacted an attorney, who subsequently drafted and sent SLS a Qualified Written Request ("QWR #1") dated April 29, 2022.

65.     In the QWR #1, Ms. Rowland's attorney (i) explained that because SLS had failed to send periodic statements since at least March 2010, its retroactive imposition of over $50,000 in interest and fees was illegal; and (ii) demanded that SLS provide a full accounting of Ms. Rowland's second-lien mortgage loan from the loan's origination.

66.     Several weeks later, on June 1, 2022, SLS sent a letter to Ms. Rowland stating that it had received correspondence from "an unauthorized third party" (*i.e.*, from Ms. Rowland's attorney) and claiming that it was "unable to respond" unless Ms. Rowland completed and returned its "third party authorization form."

67.     Ms. Rowland sent a complete signed copy of SLS's "third party authorization form" to SLS on June 13, 2022, by fax to the fax number designated at the bottom of the form.

68.    But despite Ms. Rowland's compliance with this burdensome and unnecessary "third party authorization form" process, she did not receive any further information or communications from SLS until months later, on February 1, 2023, when, instead of a response to her QWR #1, she received a document titled "Annual Transaction Account Disclosure," which listed a "principal balance" of $77,773.96.

69.    Ms. Rowland heard nothing else from SLS for the next several months.

70.    Then, on June 27, 2023, SLS sent another threatening letter to Ms. Rowland, stating: "According to our records, your mortgage loan is in serious default and has been referred to foreclosure."

71.    Soon after, on July 20, 2023, Ms. Rowland sent another Qualified Written Request ("QWR #2"), in which she asked SLS to "respond back to me in writing detailing what the current status of my home is," adding that "these foreclosure letters have and continue to cause me worry and stress."

72.    On August 7, 2023, SLS sent a boilerplate response letter claiming that Ms. Rowland's QWR #2 was "currently under review" and promising that it would "have a response issued to you within applicable state and/or federal timeframes."

73.    But SLS did no such thing.  Instead, on August 21, 2023, SLS, through its agent Affinia Default Services, LLC ("Affinia"), issued and recorded a Notice of Default with the Clerk of Alameda County, California.

74.    This Notice of Default was materially defective.

75.    For example, in this Notice of Default, SLS (through Affinia) claimed that Ms. Rowland owed $137,828.86 for her second mortgage—a figure that included over $60,000 in retroactive interest and fees, which was more than 75% of the outstanding principal balance.

76.    This inaccurate reporting of the outstanding balance of Ms. Rowland's second-lien mortgage loan violated CAL. CIVIL CODE § 2924.17, which requires a notice of default to be "accurate and complete and supported by competent and reliable evidence."  This statute also requires a mortgage servicer, before "recording or filing" a notice of default, to "ensure that it has

reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

77.    The figure listed in the Notice of Default was incorrect because it included amounts that Ms. Rowland did not owe and would not have been required to pay to cure her default.  Further, SLS, through its agent Affinia, recorded the Notice of Default before reviewing the competent and reliable evidence, including Ms. Rowland's QWRs, which would have informed them that Ms. Rowland was not liable for retroactive interest or fees from the over-thirteen-year period during which she had received no periodic statements.

78.    The filing of an accurate notice of default is a condition precedent to a foreclosure action in California—which means that, as a result of its violations of § 2924.17, SLS had no present right to possession of Ms. Rowland's property when it sent her the June 27, 2023 letter stating that her second-lien mortgage had "been referred to foreclosure."  This constitutes a violation of the FDCPA, 15 U.S.C. § 1692f(6), which prohibits a debt collector from "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if . . . (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest."

79.    To date, SLS refuses to correct its servicing error and is still seeking to collect almost $250,000 from Ms. Rowland—who has *still* not received a periodic statement from SLS since at least March 2010.

80.    Nor, to date, has Ms. Rowland received the required response to either of her QWRs.

81.    As a result of SLS's conduct, Ms. Rowland has suffered—and continues to suffer—financial and emotional harm, including but not limited to: a reduction in her present and future home equity; deferral of repayment on her legitimate debts; emotional distress caused by the inaccurate Notice of Default and the vastly inflated claims of her outstanding debt; distress from SLS's surprise threats of foreclosure after over a decade of silence; and further distress from

SLS's failure to respond to her QWRs requesting revision of the claimed outstanding balance and additional information.

### *Liz and Paul Chavez*

82.    In December 2005, Liz and Paul Chavez bought a home in Oxnard, California.

83.    To finance the purchase of their home, the Chavezes took out two mortgages, including a second-lien mortgage loan with a principal balance of $151,750.00.

84.    In 2006, SLS acquired the servicing rights for the Chavezes' second mortgage loan.

85.    In 2008, shortly after the onset of the Great Recession, the Chavezes fell behind on their mortgage payments.

86.    In early 2009, the Chavezes entered into a loan-modification agreement for their first mortgage.

87.    The Chavezes attempted to negotiate a similar loan-modification agreement with SLS for their second mortgage, but they were unsuccessful.

88.    In late 2010, the Chavezes fell behind on their mortgage payments again, and in January 2011, they entered into another loan-modification agreement for their first mortgage through the Treasury Department's Home Affordable Modification Program ("HAMP").

89.    In March 2012, after falling behind on their mortgage payments yet again, the Chavezes filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Central District of California (Bankr. Case No. 9:12-bk-10980-RR).

90.    Following their emergence from bankruptcy, the Chavezes believed that the junior lien on their property associated with their second-lien mortgage loan had been stripped as a result of their bankruptcy.

91.    For the next ten years, the Chavezes did not receive any monthly mortgage statements—or, indeed, any communications whatsoever—from SLS.

92.    Then, on February 9, 2022, after over a decade of silence, SLS sent a letter titled "Default Notice and Notice of Intent to Foreclose," in which it stated:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The Note on the [second-lien mortgage loan] is now in default as a result of your failure to pay the 10/01/08 payment and the payments due each month thereafter, as provided for in said Note. You are hereby notified that to cure such default you are required to pay to this office all past due payments plus late charges and any payments that may become due between the date of this notice and the date the default is cured. The amount required to cure the arrears as of 02/09/22 is $215,476.68. You have thirty-three (33) days from the date of this letter to cure the default. We urge you to immediately, upon receipt of this letter, contact our Customer Assistance Department at the number below to obtain the updated amount required to reinstate your loan.

93.     The March 2022 letter further stated that "[f]ailure to pay the total amount due under the terms and conditions of your Deed of Trust/Mortgage by 03/14/22 may result in acceleration of the entire balance outstanding under the Note including, but not limited to, the principal, interest and all other outstanding charges and costs, and commencement of foreclosure of the Trust Deed/Mortgage which is security for your Note." And SLS warned that "[i]f your loan is not brought current, inspections of your property will be made and you will be assessed fees for that purpose as permitted under state law."

94.     The $215,476.68 in "arrears" demanded by SLS included, along with $150,965.18 in remaining principal, nearly $65,000 in retroactive interest and fees that had purportedly accrued over the previous decade-plus.

95.     This sudden increase in the Chavezes' mortgage-debt load caused a significant reduction in their home equity.

96.     And on October 18, 2022, SLS, through its agent Affinia, issued and recorded a Notice of Default with the Clerk of Ventura County, California.

97.     This Notice of Default was materially defective.

98.     For example, in this Notice of Default, SLS (through Affinia) claimed that the Chavezes owed $226,698.88 for their second mortgage—a figure that included over $60,000 in retroactive interest and fees.

99.     This inaccurate reporting of the outstanding balance of the Chavezes' second-lien mortgage loan violated CAL. CIVIL CODE § 2924.17, which provides that a notice of default "shall be accurate and complete and supported by competent and reliable evidence." Furthermore,

before "recording or filing" a notice of default, § 2924.17 obligates a mortgage servicer to "ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

100.    The figure listed in the Notice of Default was incorrect because it included amounts that the Chavezes did not owe and would not have been required to pay to cure their default.  Further, SLS, through its agent Affinia, recorded the Notice of Default before reviewing the competent and reliable evidence, which would have informed SLS that the Chavezes were not liable for the retroactive interest or fees for the decade in which they received no monthly statements.

101.    On July 5, 2023, Chavezes sent a Qualified Written Request ("QWR") to SLS in which they: (i) informed SLS that they had not received a loan statement since February 2012; and (ii) asked SLS to provide them with copies of certain specified documents from their file.

102.    Shortly thereafter (but not in response to the QWR), on July 7, 2023, SLS sent a letter to the Chavezes in which it demanded $240,794.30 to "reinstate" their second-lien mortgage loan.  This revised figure now included nearly $90,000 in retroactive interest and fees, which was more than 60% of the outstanding principal balance.

103.    SLS received the Chavezes' July 5 QWR on July 10, 2023.  To date, SLS still has not sent a response to this QWR.

104.    On July 17, 2023, for the first time since February 2012, SLS finally sent a mortgage statement to the Chavezes, still without responding to the QWR.  This statement claimed that the Chavezes owed a "total payment amount" of $241,583.33, which again included over $90,000 in retroactive interest and fees.

105.    To date, SLS refuses to correct its servicing error and is still seeking to collect almost $250,000 from the Chavezes, including through a foreclosure sale of the Chavezes' property that is currently scheduled for November 16, 2023.

106.    As a result of SLS's conduct, the Chavezes have suffered—and continue to suffer—financial and emotional harm, including but not limited to: a reduction in their present

and future home equity; deferral of repayment on their legitimate debts; emotional distress caused by the inaccurate Notice of Default and the vastly inflated claims of their outstanding debt; distress from SLS's surprise institution of foreclosure after a decade of silence; and further distress from SLS's failure to respond to their QWR requesting additional information regarding SLS's claims.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring their claims on behalf of themselves individually and, under Fed. R. Civ. P. 23(b)(3), on behalf of these Classes:

### FDCPA Class

All California consumers who (i) are or were obligors with respect to a closed-end, second-lien residential mortgage loan; (ii) serviced by SLS on behalf of a third party; (iii) whose second-lien residential mortgage loan was in default at the time that SLS acquired the loan's servicing rights; (iv) to whom SLS (or its predecessor-in-interest) failed to send periodic statements; and (v) to whom SLS or its agent, during the one-year period prior to the filing of this Complaint, sent a loan statement or other written document referencing interest or late fees that purportedly accrued during any period in which SLS or its predecessor-in-interest had failed to send periodic statements.

### Rosenthal Act Class

All California consumers who (i) are or were obligors with respect to a closed-end, second-lien residential mortgage loan; (ii) owned by, assigned to, or serviced by SLS; (iii) to whom SLS (or its predecessor-in-interest) failed to send periodic statements; and (iv) to whom SLS or its agent, during the one-year period prior to the filing of this Complaint, sent a loan statement or other written document referencing interest or late fees that purportedly accrued during any period in which SLS or its predecessor-in-interest had failed to send periodic statements.

### UCL Class

All California consumers who (i) are or were obligors with respect to a closed-end, second-lien residential mortgage loan; (ii) owned by, assigned to, or serviced by SLS; (iii) to whom SLS (or its predecessor-in-interest) failed to send periodic statements; and (iv) to whom SLS or its agent, during the four-year period prior to the filing of this Complaint, sent a loan statement or other written document referencing interest or late fees that purportedly accrued during any period in which SLS or its predecessor-in-interest had failed to send periodic statements.

108.    Ms. Rowland is a member and representative of the FDCPA Class, while all Plaintiffs are members and representatives of the Rosenthal Act Class and the UCL Class.

109.    These Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(3).  Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

110.    <u>Numerosity:</u> The Classes are so numerous that joinder of all class members is impracticable.  Given the volume of SLS's business, there are hundreds or thousands of class members.

111.    <u>Commonality</u>:  This case presents common questions of law and fact, including but not limited to:

    a.  Whether SLS violated the FDCPA and the Rosenthal Act by making false representations about the character, amount, or legal status of a debt; threatening to take actions that could not be legally taken; using false representations to attempt to collect a debt; and attempting to collect an amount not expressly authorized by a loan agreement;

    b.  Whether SLS's conduct was unlawful, unfair, or fraudulent under the UCL;

    c.  The proper scope of injunctive relief; and

    d.  The proper measure of damages.

112.    <u>Typicality:</u> Plaintiffs' claims are typical of the members of the Class.  The FDCPA, Rosenthal Act, and UCL violations suffered by Plaintiffs are typical of those suffered by other class members, and SLS treated Plaintiffs consistently with other class members, in accordance with its standard policies and practices.  Discovery will show that SLS used automated processes to generate and send form debt-collection correspondence to class members and that SLS maintains electronic records indicating which form correspondence was sent to each class members, as well as the date(s) on which such correspondence was sent.  Discovery will also show that these debt-collection communications were often identical in both form and substance,

except only for recipient-specific information regarding the recipient's name and address and the specific amounts SLS claimed were owed.   Discovery will also show that SLS maintains electronic records of amounts it contends are owed by each borrower, as well as amounts paid by each borrower, including records of the dates on which each payment was made.

113.   Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Classes because they and their experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

114.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  SLS's conduct, as described in this Complaint, stems from common and uniform policies and practices, and it has resulted in common violations of the FDCPA, the Rosenthal Act, and the UCL.  Members of the Classes do not have an interest in pursuing separate actions against SLS, as the value of each class member's individual claim is relatively small compared to the substantial expense, burden, and uncertainty of individual prosecution.  Class certification also will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments concerning SLS's practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

115.   The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**COUNT I**
**Fair Debt Collection Practice Act ("FDCPA")**
**15 U.S.C. § 1692e**
(**on behalf of Plaintiff Teresa Rowland and the FDCPA Class**)

116.   Plaintiff Teresa Rowland incorporates the preceding allegations.

117.    The FDCPA outlaws, among other conduct, the following debt-collection practices: making false representations about the character, amount, or legal status of a debt (15 U.S.C. § 1692e(2)(A)); threatening to take action that cannot be legally taken (15 U.S.C. § 1692e(5)); and using a false representation to collect or attempt to collect a debt (15 U.S.C. § 1692e(10)).

118.    SLS violated each of these provisions with respect to Ms. Rowland and the members of the FDCPA Class when it attempted to collect retroactively-assessed interest and late fees that were illegal because they had purportedly accrued during a period in which SLS had violated TILA and Regulation Z by failing to send periodic statements.

119.    Ms. Rowland and each member of the FDCPA Class suffered a concrete injury-in-fact due to SLS's misrepresentations, including, for example, a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their second mortgages and avoid foreclosure.

120.    In addition, some members of the FDCPA Class suffered actual damages when they paid these improper fees and/or interest to SLS.

121.    Under 15 U.S.C. § 1692k, Ms. Rowland seeks actual and statutory damages for herself and for each member of the FDCPA Class, plus reasonable attorneys' fees and costs.  She also seeks actual damages for members of the FDCPA Class who paid improper interest or fees to SLS, in the amount of any such interest or fees.

<u>**COUNT II**</u>
**Rosenthal Fair Debt Collection Practices Act**
**Cal. Civ. Code. § 1788.17**
(***on behalf of Plaintiffs individually and of the Rosenthal Act Class***)

122.    Plaintiffs incorporate the preceding allegations.

123.    Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to

1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692e and 1692k.

124.    Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the FDCPA provisions incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692e and 1692k. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

125.    SLS therefore violated Section 1788.17 of the Rosenthal Act with respect to Plaintiffs and the members of the Rosenthal Act Class when it attempted to collect retroactively-assessed interest and late fees that were illegal because they had purportedly accrued during a period in which SLS had violated TILA and Regulation Z by failing to send periodic statements.

126.    Plaintiffs and each member of the Rosenthal Act Class suffered a concrete injury-in-fact due to SLS's misrepresentations, including, for example, a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their second mortgages and avoid foreclosure.

127.    In addition, some members of the Rosenthal Act Class suffered actual damages when they paid these improper fees and interest to SLS.

128.    Under 15 U.S.C. § 1692k, as incorporated by § 1788.17 of the Rosenthal Act, Plaintiffs seek actual and statutory damages for themselves and for each member of the Rosenthal Act Class, plus their reasonable attorneys' fees and costs. They also seek actual damages for members of the Rosenthal Act Class members who paid improper interest or fees to SLS, in the amount of any such interest or fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III
**California Unfair Competition Law**
**CAL. BUS. & PROF. CODE §§ 17200 *et seq.***
(*on behalf of Plaintiffs individually and of the UCL Class*)

129.     Plaintiffs incorporate the preceding allegations.

130.     California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.

131.     By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall*, *Inc.*, 5 Cal. 5th 966, 980 (2018).

132.     The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws." CAL. BUS. & PROF. CODE § 17205.

133.     An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct.

134.     Here, SLS's practices were "unlawful" under the UCL because, as alleged above, they violate TILA, the FDCPA, and the Rosenthal Act.

135.     SLS's practices were also "unfair" under the UCL because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to fail to communicate fees and interest for years, sometimes a decade or more, allowing the balance to balloon without any notice to the consumers that might permit them to mitigate the harm.

136.     Further, SLS's practices were "fraudulent" because it made false statements about the amounts legally owed by Plaintiffs and members of the UCL Class and it omitted information necessary for Plaintiffs and members of the UCL Class to assess the truth of SLS's claims (*i.e.*, that the debts to which SLS claimed to be entitled were time barred due to SLS's failure to provide periodic statements).

137.     The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

---

**CLASS ACTION COMPLAINT - 22**

1     138.    Plaintiffs and members of the UCL Class suffered injuries in fact and have lost

2   money or property as a result of SLS's practices, which have caused an increase in their debt

3   loads and a decrease in their home equity.

4     139.    Because, to this day, SLS persists in its efforts to collect these illegitimate fees and

5   interest, there is a real and immediate threat that Plaintiffs and members of the UCL Class will

6   suffer these same injuries again.

7     140.    Plaintiffs and members of the UCL Class are therefore entitled to injunctive relief

8   to correct the balances on their second mortgages; actual damages in the amount of any illegal

9   fees or charges paid by the class members; and the recovery of their reasonable attorneys' fees

10  and costs.

11                              **COUNT IV**
                    **FDCPA, 15 U.S.C. § 1692f(6)**
12          (***on behalf of Plaintiff Teresa Rowland individually***)

13    141.    Plaintiff Teresa Rowland incorporates the preceding allegations.

14    142.    SLS violated 15 U.S.C. § 1692f(6) when it attempted to foreclose on Ms.

15  Rowland's property.  SLS did not have any present right to possession of the property at the time

16  that it scheduled the foreclosure sale.

17    143.    For example, Ms. Rowland was never sent a Notice of Default that complied with

18  CAL. CIV. CODE § 2924. The Notice of Default that Ms. Rowland received did not contain the

19  correct amount of the delinquency required to cure the default—a condition precedent to

20  foreclosure under California law.

21    144.    This defect in the Notice of Default was material and adversely affected Ms.

22  Rowland's rights because it made it appear as if she owed almost double her actual loan balance.

23    145.    As a result of SLS's violations of 15 U.S.C. § 1692f, Ms. Rowland suffered actual

24  damages, including significant emotional distress.

25    146.    Based on SLS's violation of § 1692f, Ms. Rowland is entitled to actual damages,

26  statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

1

2

### COUNT V
**Rosenthal Fair Debt Collection Practices Act**
**CAL. CIV. CODE. § 1788.17**
**(*on behalf of Plaintiffs Teresa Rowland, Liz Chavez, and Paul Chavez individually*)**

147.    Plaintiffs incorporate the preceding allegations.

148.    Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692f(6) and 1692k.

149.    Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the provisions of FDCPA incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692f(6) and 1692. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

150.    In addition to the FDCPA, therefore, SLS violated Section 1788.17 of the Rosenthal Act when it attempted to foreclose on Plaintiffs' properties. SLS did not have any present right to possession of Plaintiffs' properties at the time that it scheduled the foreclosure sales.

151.    For example, Plaintiffs were never sent a Notice of Default that complied with CAL. CIV. CODE § 2924. Neither of the Notices of Default that Plaintiffs received included the correct amount of the delinquency required to cure the default, which is a condition precedent to foreclosure under California law.

152.    This defect in each Notice of Default was material, and it adversely affected Plaintiffs' rights, because it made it appear as if Plaintiffs owed significantly more than they actually did on their second-lien mortgage loans.

153.    As a result of SLS's violations, Plaintiffs suffered actual damages, including significant emotional distress.

154.    Under CAL. CIV. CODE § 1788 and 15 U.S.C. § 1692k, Plaintiffs seek actual and statutory damages for themselves, plus their reasonable attorneys' fees and costs.

## COUNT VI
### RESPA, 12 U.S.C. § 2605(e)(2)
**(*on behalf of Plaintiffs Teresa Rowland, Liz Chavez, and Paul Chavez individually*)**

155.    Plaintiffs incorporate the preceding allegations.

156.    As alleged above, Teresa Rowland submitted two Qualified Written Requests to SLS, each of which SLS received.  Likewise, the Chavezes submitted a Qualified Written Request to SLS, which SLS received.

157.    Each Qualified Written Request was sent to SLS's designated address for Qualified Written Requests.

158.    Each Qualified Written Request included sufficient information to identify Plaintiffs, including their personal information and respective loan numbers.

159.    SLS violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiffs' accounts, including removal of the improper interest from their accounts.

160.    SLS also violated 12 U.S.C. § 2605(e)(2) by failing to provide Ms. Rowland with the information that she requested or to explain why the requested information was unavailable.

161.    As a result of SLS's conduct, Plaintiffs suffered concrete and particularized harm, including an assessment of fees and charges that they did not owe, and emotional distress including aggravation and stress.

162.    Upon information and belief, discovery will reveal that SLS's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance.

163.    Indeed, SLS has been sued multiple times for failing to properly respond to Qualified Written Requests, including by failing to conduct proper investigations or to provide requested information.

164.    In addition, the CFPB's consumer complaint portal shows that at least 7,464 mortgage-related complaints have been filed against SLS as of August 23, 2023, including 134 complaints for failing to investigate an existing problem.

165.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for each of its violations of 12 U.S.C. §§ 2605(e)(2) and 2605(f).

**COUNT VII**
**California Homeowner Bill of Rights ("HBOR"),**
**CAL. CIVIL CODE §§ 2924.17 and 2924.12 or 2924.19**
***(on behalf of Plaintiffs Teresa Rowland, Liz Chavez, and Paul Chavez individually)***

166.    Plaintiffs incorporate the preceding allegations.

167.    Under CAL. CIVIL CODE § 2924.17, a notice of default must be "accurate and complete and supported by competent and reliable evidence."  Furthermore, before "recording or filing" a notice of default, § 2924.17 obligates a mortgage servicer to "ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information."

168.    With respect to mortgage servicers who have foreclosed on more than 175 California residential properties in the immediately preceding annual-reporting period, CAL. CIVIL CODE § 2924.12(a)(1) provides a private right of action for injunctive relief to enforce a material violation of § 2924.17, and it further provides that any such injunction "shall remain in place and any trustee's sale shall be enjoined until the court determines that the mortgage servicer . . . has corrected and remedied the violation or violations giving rise to the action for injunctive relief."

169.    With respect to mortgage servicers who have foreclosed on 175 or fewer California residential properties in the immediately preceding annual-reporting period, CAL. CIVIL CODE § 2924.19(a)(1) provides an identical private right of action for injunctive relief.

170.    On information and belief, SLS is a mortgage servicer subject to CAL. CIVIL CODE § 2924.12 because it has foreclosed on more than 175 California residential properties in the

immediately preceding annual-reporting period.  In the alternative, SLS is a mortgage servicer subject to CAL. CIVIL CODE § 2924.19.

171.    Here, SLS materially violated CAL. CIVIL CODE § 2924.17 with respect to Plaintiffs when, through its agent Affinia, it issued and recorded Notices of Default with the Clerk of Alameda County, California (for Ms. Rowland) and the Clerk of Ventura County, California (for the Chavezes) that were inaccurate because they did not contain the correct amount of the delinquency required to cure Plaintiffs' respective defaults.

172.    Plaintiffs are therefore entitled to injunctive relief, under either § 2924.12(a)(1) or § 2924.19(a)(1), to enjoin SLS's material violation of § 2924.17.

173.    Under either § 2924.12(h) or § 2924.19(h), Plaintiffs are also entitled to recovery of their reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, seek the following relief:

a.    Determining that this action may proceed as a class action under Fed. R. Civ. P. 23;

b.    Designating Plaintiffs as the class representatives for the Classes;

c.    Designating Plaintiffs' Counsel as counsel for the Classes;

d.    Issuing proper notice to the Classes at SLS's expense;

e.    Declaring that SLS committed multiple, separate violations of the FDCPA, the Rosenthal Act, the UCL, RESPA, and the HBOR;

f.    Declaring that amounts claimed by SLS are not owed;

g.    Awarding actual and statutory damages as provided by the FDCPA, the Rosenthal Act, the UCL, RESPA, and the HBOR;

h.    Granting appropriate injunctive relief, including restitution and disgorgement, as provided by the UCL;

i.    Awarding reasonable attorneys' fees and costs and expenses; and

j.   Granting other relief, in law or equity, as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury on all issues triable by a jury.

Dated: October 26, 2023                          Respectfully submitted,

/s/Julie Pollock
Julie Pollock (SBN 346081)
**BERGER MONTAGUE PC**
505 Montgomery St, Suite 625
San Francisco, CA 94111
Tel: (415) 906-0684
Fax: (215) 875-4604
jpollock@bm.net

E. Michelle Drake*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel : (612) 594-5999
emdrake@bm.net

Zachary M. Vaughan*
**BERGER MONTAGUE PC**
2001 Pennsylvania Ave NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9740
zvaughan@bm.net
*pro hac vice* forthcoming

Kristi C. Kelly*
**KELLY GUZZO PLC**
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
Tel: (703) 424-7570
kkelly@kellyguzzo.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff*